78 N.Y.2d 158 (1991)
New York State Association of Counties, Individually and on Behalf of 42 of Its Member Counties that Own and Operate Residential Health Care Facilities in the State of New York, Appellant,
v.
David Axelrod, as Commissioner of the New York State Department of Health, et al., Respondents.
Court of Appeals of the State of New York.
Argued April 30, 1991.
Decided June 27, 1991.
Peter G. Bergmann, Kathy Hirata Chin and William J. Natbony for appellant.
Robert Abrams, Attorney-General (Clifford A. Royael, O. Peter Sherwood and Peter H. Schiff of counsel), for respondents.
Cornelius D. Murray and David M. Cherubin for New York State Health Facilities Association, Inc., amicus curiae.
Susan C. Waltman for the Greater New York Hospital Association, amicus curiae.
Brian D. Ellsworth for the New York Association of Homes and Services for the Aging, Inc., amicus curiae.
Judges SIMONS, KAYE and ALEXANDER concur with Judge BELLACOSA; Judge HANCOCK, JR., dissents and votes to affirm in a separate opinion in which Judge TITONE concurs; Chief Judge WACHTLER taking no part.
*161 BELLACOSA, J.
The defendants, collectively referred to as the Department of Health (DOH), adopted a new method in 1986 for Medicaid reimbursement to nursing homes. Shortly thereafter, to contain costs and reduce all reimbursements, DOH effected an across-the-board percentage reduction to the new reimbursement rate method as a purported "corrective measure". Plaintiff, New York State Association of Counties (NYSAC), sued to annul this Medicaid reimbursement recalibration regulation (10 NYCRR 86-2.31). We hold that NYSAC's lawsuit was timely commenced and that the regulation should be *162 annulled as lacking a rational basis. Thus, the order of the Appellate Division granting DOH summary judgment should be reversed and NYSAC's motion for summary judgment should be granted.

FACTUAL AND LITIGATION CONTEXT
NYSAC is a nonprofit association of all 62 counties in this State, 42 of which own and operate nursing homes or residential health care facilities. Prior to January 1986, Medicaid reimbursement rates were calculated based on a per-day per-patient cost determined on the basis of allowable costs in a prior year  the base year  increased by a trend factor to account for inflation but limited by certain ceiling costs. Under that method, a facility received the same per diem rate for all patients in its care, regardless of the severity of each patient's care needs or condition.
In October 1985, DOH promulgated the "Long Term Care Case Mix Reimbursement System" (System) effective January 1986. The System is composed of four components: direct, indirect, noncomparable and capital costs (10 NYCRR 86-2.10 [b] [1] [ii]). The only aspect at issue in this case is the "direct" component of the rate formula, arrived at by a methodology known as RUG-II ("Resource Utilization Group") (see, 10 NYCRR subpart 86-2). The System was designed to produce reimbursement rates that reflect the relative resource needs of patients and to provide an incentive to facilities to reduce expenditures and to admit patients requiring more resource-intensive services and care. It was designed to be budget-neutral, i.e., it was not intended to increase over-all Medicaid reimbursement. Based on extensive study and analysis of patients and data in 1984 and 1985, 16 patient classification categories or "Resource Utilization Groups" were established (see, 10 NYCRR Appendix 13-A). Under this RUG-II formula, each patient is categorized based on a "Patient Review Instrument" (the PRI form), completed semiannually by a qualified registered nurse (10 NYCRR 86-2.30 [c] [2]). The PRIs require detailed information evaluating patients' conditions, treatments, dependencies and required care, needs and services. PRIs are also certified by the facility's operator and the responsible nurse assessor (10 NYCRR 86-2.30 [c] [4]). The weighted sum of a facility's patient distribution in the 16 categories is its "case mix index" (CMI). Reimbursement rates under the RUG-II method were based on the number of *163 patients in each category for whom a facility was caring, i.e., the facility's total CMI.
The reimbursement rates were initially based on the State-wide average CMI derived from the data submitted on PRIs in 1985. Facilities were notified in November 1985 of their 1986 reimbursement rates based on the 1985 PRIs. However, on August 6, 1986, just seven months after the RUG-II method went into effect, DOH proposed to the State Hospital Review and Planning Council that the payment rates under the RUG-II method should be reduced. The process was dubbed "recalibration" and was then defined as the resetting of prices that correspond to the CMIs, that is, new reduced rates were to be assigned to the CMI figures (see, 10 NYCRR Appendix 13-A). The proffered justification for this "recalibration" was to set rates for the RUG-II system "on the basis of the most accurate data available regarding patient mix." (Emphasis added.) DOH explained that from 1985-1986 the facilities' understanding of the patient assessment system had improved in such a way as to increase the accuracy of the PRIs in 1986, thus increasing facilities' CMIs. DOH determined the reimbursement rates should therefore be adjusted downward, i.e., recalibrated, because 1986 PRIs were being completed based on "a fuller understanding of the implications of the PRI regulations, and thus [were] more representative of the future PRI data the Department [would] receive."
DOH recognized that to determine the justifiable percentage it would be necessary to separate the change in CMI attributable solely to more accurate PRI data from the increase in CMIs attributable to actual change in patient conditions, care needs and resource utilization. In an effort to document that differentiation, DOH compared CMIs for patients in 1985 with CMIs for patients in 1986, excluding data for patients whose length of stay at a facility was fewer than 90 days and those admitted after January 1, 1986. DOH determined that the average increase in CMI was 3.92%, or 3.2% if rehabilitation patients were excluded. DOH then concluded that the improved accuracy in PRI completion, or "paper optimization", had resulted in an increase in RUG-II categorization and consequently CMI unrelated to patient condition or care needs. This, in turn, resulted in larger reimbursements without a correlative increase in resource utilization. That is, increasingly more accurate PRIs resulted in higher reimbursement to facilities, while the level of care remained unchanged, according to DOH's cost containment calculus. The apparent *164 explanation is that DOH found it unacceptable that some facilities were garnering increased reimbursements by achieving improved compliance under the new methodology and its reporting requirements. DOH, in effect, penalized all providers by altering the reimbursement formula downward.
The Hospital Review and Planning Council adopted and the Commissioner of Health approved the uniform reduction or "recalibration" of 3.035%, effected by the following challenged regulation:
"86-2.31 Recalibration. (a) For rate periods commencing on or after January 1, 1987, notwithstanding any other provisions of this Subpart, the direct component of facility rates, determined in accordance with sections 86-2.10 and 86-2.11 of this Subpart, shall be reduced by 3.035 percent to reflect a recalibration adjustment based on the change in the aggregate statewide case mix index attributable to factors other than changes in patient population or condition." (10 NYCRR 86-2.31 [emphasis added].)
The recalibration reduced the direct component of every facility's Medicaid reimbursement rate by 3.035% regardless of actual change  if any  experienced by a facility in its CMI. DOH did not reset rates that corresponded to the CMI values, as it had explained it would do.
DOH filed the recalibration regulation with the Secretary of State on December 10, 1986. The implementation date was July 1, 1987, retroactive to January 1, 1987 (10 NYCRR 86-2.31 [b]). Rate computation notices for 1987 were sent to NYSAC's members from October 1986 through June 1987 indicating that the respective facility's reimbursement rates would be subject to a "zero percent" recalibration rate. Nonetheless, in June 1987, DOH changed its course and notified all facilities that the direct cost component for 1987 rates would be reduced by 3.035%, retroactive to January 1987, adverting to nonempirical "[s]tudies [that] have shown an increase in case mix [since September 30, 1985], which has been determined to be unrelated to patient characteristics." On June 2, 1987, NYSAC's members received rate computation notices for the first time, reflecting the reduced 3.035% recalibration rate.
NYSAC brought a CPLR article 78 proceeding on October 2, 1987 alleging in three causes of action that the regulation: (1) *165 is arbitrary and capricious, an abuse of discretion and without a rational basis; (2) violates Public Health Law §§ 2807 and 2808; and (3) deprives the nursing homes of due process of law. DOH's motion for an order dismissing the petition on Statute of Limitations grounds was denied and the proceeding was converted into a declaratory judgment action (see, CPLR 103 [c]). Supreme Court applied the CPLR 213 six-year Statute of Limitations and determined that the action was timely. Thereafter, Supreme Court granted NYSAC's motion for summary judgment and declared the recalibration regulation (10 NYCRR 86-2.31) null and void as arbitrary and capricious, and directed DOH to recompute the reimbursement rates for the affected years, determining that there was no "rational basis for the promulgation of a rule so broad in scope."
The Appellate Division unanimously reversed and granted summary judgment to DOH dismissing NYSAC's first and second causes of action as time barred and declared that the recalibration regulation is constitutional (156 AD2d 14). That court applied the CPLR 217 article 78 four-month Statute of Limitations, holding that NYSAC's cause of action accrued on the effective date of the regulation, January 1, 1987, and that the limitation period had expired before NYSAC commenced this action in October 1987 (compare, New York State Assn. of Counties v Axelrod, 150 AD2d 845, lv dismissed 75 N.Y.2d 765).

STATUTE OF LIMITATIONS
Article 78 proceedings must be commenced within four months after the determination to be reviewed becomes "final and binding upon the petitioner" (CPLR 217; Matter of Village of Westbury v Department of Transp., 75 N.Y.2d 62, 72; see, Siegel, NY Prac § 566 [2d ed 1991]). NYSAC's lawsuit is timely because it was commenced within four months of its members' receipt of the rate recomputation notices which, for the first time, apprised the facilities of their actual reimbursement rates. The DOH determination could not be deemed "final" for article 78 purposes until NYSAC's members were able to ascertain the consequences of the recalibration regulation so that its impact could be accurately assessed, including awareness whether the facilities were aggrieved (see, Matter of Martin v Ronan, 44 N.Y.2d 374, 380-381; Matter of Jewish Mem. Hosp. v Whalen, 47 N.Y.2d 331, 343; see also, Matter of Abrams v Public Serv. Commn., 61 N.Y.2d 718, affg without opn 96 AD2d 701). Although the facilities had received notice on *166 or around November 1, 1986 of their 1987 rates, which identified the direct component of the rate, that notification preceded the December 1986 adoption of the recalibration regulation which effected the 3.035% reduction to the direct cost component. NYSAC's members could not reasonably calculate the impact of the recalibration prior to receipt of the rate calculation notice on June 2, 1987, since their CMIs and therefore their reimbursement rates fluctuated significantly between November 1986 and June 2, 1987.
It is worthy of note that DOH's notification to the facilities up to two months before the July 1 implementation date indicating that recalibration would be at "zero percent" injected ambiguity and uncertainty as to when and whether the determination became  or was intended to be  final and binding (Mundy v Nassau County Civ. Serv. Commn., 44 N.Y.2d 352, 358; see, Matter of Edmead v McGuire, 67 N.Y.2d 714; Matter of Biondo v New York State Bd. of Parole, 60 N.Y.2d 832, 834).
Since the lawsuit was timely commenced within the four-month period of limitations  the shortest possible period arguably applicable to the claims asserted in the petition  there is no reason to address the question whether the six-year Statute of Limitations governing declaratory judgment actions might be applicable to the petition challenging this regulation.

MERITS  IRRATIONALITY
We start our discussion of the merits with the elemental proposition that an administrative regulation will be upheld only if it has a rational basis, and is not unreasonable, arbitrary or capricious (Matter of Bates v Toia, 45 N.Y.2d 460, 464; Matter of Bernstein v Toia, 43 N.Y.2d 437, 448; Ostrer v Schenck, 41 N.Y.2d 782, 786). Administrative rules are not judicially reviewed pro forma in a vacuum, but are scrutinized for genuine reasonableness and rationality in the specific context (Matter of Bates v Toia, supra, at 464). The challenger must establish that a regulation "is so lacking in reason for its promulgation that it is essentially arbitrary." (Matter of Marburg v Cole, 286 N.Y. 202, 212; see, Molina v Games Mgt. Servs., 58 N.Y.2d 523, 529; Matter of Bates v Toia, supra, at 464; Matter of Bernstein v Toia, supra, at 448; Ostrer v Schenck, supra, at 786.) DOH's rate-setting action may be declared null and void "`upon a compelling showing that the calculations from which [it is] derived [are] unreasonable'" (Matter of Society of N. Y. Hosp. v Axelrod, 70 N.Y.2d 467, 473; *167 Matter of Catholic Med. Center v Department of Health, 48 N.Y.2d 967, 968; Matter of Sigety v Ingraham, 29 N.Y.2d 110, 114). It is not the judicial function to address, and we do not consider, the "policy considerations underlying the standard" applied on review (dissenting opn, at 170).
We conclude that the recalibration regulation effecting a 3.035% reduction to Medicaid reimbursement rates regardless of the actual causes of facilities' change  if any  in CMI and without record evidence to support DOH's supposition that the CMI increase is solely attributable to "paper optimization" lacks a rational basis.
DOH, on the one hand, promulgated and implemented the RUG-II methodology so that reimbursement rates would reflect relative resources expended on behalf of patients. The new methodology, established after extensive study, was designed to provide incentives to facilities to provide more intensive treatment to patients where necessary, to admit patients requiring more resource-intensive services and care, and to assure that reimbursement would be based on facility-specific CMIs. Then, on the other hand, when DOH did not like some of what this new process had wrought, it swiftly superimposed the recalibration reduction regulation. The universal 3.035% reduction to the direct component of all facilities' rates  without adequate record support or correlation to the reasons for facilities' change in CMI  clashes with the design and intendment of the RUG-II methodology. DOH seems to be taking back from facilities with one hand that which it proffered them individually with the other  incentives for improved care for the relatively more needy, reimbursed accordingly. This approach to administrative rule making must not be countenanced within the limited, though searching, judicial review.
The record supports the arbitrariness of the percentage figure selected for reimbursement reduction  3.035%. DOH did not reduce the rates of the RUG-II categories themselves, but instead reduced the direct component by an arbitrary, across-the-board percentage figure. DOH has attempted to justify this percentage reduction under the rubric of improved accuracy in PRI completion, or "paper optimization". While it appears that with experience facilities improved the accuracy of their PRI reporting methods, critical to our narrow holding of irrationality in this particular case is that the DOH documentation in the record totally lacks any justification for the *168 conclusion that the resulting increase in facilities' CMIs was solely attributable to factors other than actual change in patient conditions, care needs and resource utilization. The blanket percentage reduction selected was, as DOH concedes, the result of negotiation, compromise and estimation. That is not the equivalent of the requisite rationality. It was not based on a rational, documented, empirical determination that all facilities had experienced  even on average or mean  a 3.035% increase in CMI attributable solely to improved PRI reporting compliance experience. While discourse with the affected industry is surely appropriate, it is no substitute for DOH's obligation to promulgate reasonable and rational regulations. DOH failed to substantiate what therefore amounted only to a theory and assumption  arrived at swiftly and certainly not after any reasonable or measured period of empirical documentation, assessment and evaluation  that patient deterioration, i.e., actual increased resource utilization, played no part in the increase in CMIs. Its predicates are entirely conclusory.
Adding to the lack of rational basis of this recalibration regulation is the discriminatory and disparate impact it has on and among the affected facilities where DOH has utterly failed to substantiate its conclusion that "paper optimization" alone caused the average increase in CMIs State-wide. Facilities that experienced little or no change in CMIs received disproportionate aggregate reductions to the direct cost component of their rates  the largest reimbursement component  while facilities which realized substantial increases in CMIs received relative windfall benefits by having their direct component rates reduced in aggregate by far less than their realized increases. This impact was particularly disproportionate on county nursing homes which the record evidence indicates experienced the least upward movement in CMIs.
We do not, of course, conclude that across-the-board reimbursement formulae based on State-wide averages are impermissible. Rather, our ruling is based on petitioner's demonstration that DOH failed on these facts to document and substantiate its conclusion and the supposition on which this recalibration regulation rests  that the State-wide change in CMI was solely attributable to "paper optimization" and not at all attributable to patient deterioration, increased resource utilization and patient care.
The characterizations in the dissenting opinion of the majority's *169 analysis as generating unwarranted precedential policy and administrative law consequences are inaccurate. This straightforward application of the traditional judicial review function to a particular record and regulation, rather than proving "troublesome", will help to insure that powerful regulatory officials conform to ordinary standards of documented and rational rule making. The courts should not be relegated to searching for and fashioning justifications for agency actions, based on "simple processes of elimination" at the appellate review stage.
Finally, we need not and do not reach the constitutional question. We have also examined the other issues raised by the parties and determine that they do not affect the analysis or result in this case. Finally, we note with no implication whatsoever the pending challenge to the primary regulation, the RUG-II system (New York State Assn. of Counties v Axelrod, 150 AD2d 845, lv dismissed 75 N.Y.2d 765, supra).
Accordingly, NYSAC's appeal taken as of right should be dismissed on the ground that no substantial constitutional question is directly involved; NYSAC's motion for leave to appeal should be granted, and the order of the Appellate Division should be reversed, with costs, and the judgment of Supreme Court declaring the recalibration regulation (10 NYCRR 86-2.31) null and void reinstated.
HANCOCK, JR., J. (dissenting).
The majority holds that the Department of Health's recalibration regulation which reduces Medicaid reimbursement rates by 3.035% is unreasonable and without rational basis, because the Department failed to consider "the actual causes of facilities' change  if any  in CMI" (see, majority opn, at 167) and because there is no "record evidence to support [the Department's] supposition that the CMI increase is solely attributable to `paper optimization'" (see, id., at 167).[1]
In reaching this conclusion, the majority not only disregards the ample proof in the record that the change in average CMI resulted from "paper optimization", it reaches well beyond the narrow limits of appropriate judicial review of the type of administrative action before us. Moreover, it ignores the very standard of review that it purports to apply. Because the *170 majority's holding does not withstand analysis and amounts to an unwarranted intrusion into matters properly left to the experience and expertise of the Commissioner of Health, we dissent.[2]

I
The accepted standard for reviewing an administrative regulation of the type before us is not in dispute: (1) that a regulation will be upheld "if it has a rational basis, and is not unreasonable, arbitrary or capricious" (majority opn, at 166) and (2) that if the regulation is to be nullified, "[t]he challenger must establish that `[it] is so lacking in reason for its promulgation that it is essentially arbitrary.'" (Id. [emphasis added], quoting Matter of Marburg v Cole, 286 N.Y. 202, 212.) A review of the important policy considerations underlying the standard is necessary here.
The rationality standard is designed to ensure no more than that the administrative action being reviewed is reasonable and fair. It necessarily contemplates a high degree of deference to the agency's rule-making determination, particularly where, as here, the rule involves areas within the agency's expertise (see, 5 Davis, Administrative Law § 29:3, at 343; see also, Sunstein, Law and Administration After Chevron, 90 Colum L Rev 2071, 2117). This deference reflects both the judiciary's recognition of its own lack of competence in the frequently complex and technical areas covered by administrative regulations and the agency's presumed competence and proficiency in these matters (see, 5 Davis, op. cit., § 29:3, at 343). For these reasons, courts are and should be reluctant to disturb the substantive decisions of an administrative agency in the lawful exercise of its rule-making function (id.). Complying with this established doctrine, this Court has routinely sustained regulations under the rationality standard (see, e.g., Matter of New York State Health Facilities Assn. v Axelrod, 77 N.Y.2d 340, 349-350; Molina v Games Mgt. Servs., 58 N.Y.2d 523, 529-530; Matter of Catholic Med. Center v Department of Health, 48 N.Y.2d 967, 968-969; Matter of Bates v Toia, 45 N.Y.2d 460, 464; Matter of Bernstein v Toia, 43 N.Y.2d 437, 448; Matter of St. Lukes Hosp. Center v Ingraham, 43 N.Y.2d 771, affg on opn below at 52 AD2d 181; Ostrer v Schenck, 41 N.Y.2d 782, 785-788; *171 Matter of Sigety v Ingraham, 29 N.Y.2d 110, 115-116; Grossman v Baumgartner, 17 N.Y.2d 345, 349-350).
To be sure, this Court has in rare instances invalidated regulations because they lacked a rational basis where the record contained no evidence to support the regulation (see, e.g., Matter of Jewish Mem. Hosp. v Whalen, 47 N.Y.2d 331, 343; Matter of Hawley v Cuomo, 46 N.Y.2d 990, 992).[3] But such cases are entirely consistent with the rule that all that is required under the rationality standard is some evidentiary basis for the regulation.
The foregoing policy considerations are certainly applicable in reviewing the establishment of Medicaid reimbursement rates (see, Matter of Catholic Med. Center v Department of Health, supra; Matter of Sigety v Ingraham, supra; see also, Matter of New York State Health Facilities Assn. v Axelrod, supra, at 346-347). Indeed, it is difficult to imagine an area where the considerations calling for judicial deference could be more compelling than in Medicaid rate setting where the Legislature has broadly delegated the responsibility to the Commissioner of Health. In carrying out his rate-setting function, the Commissioner is required to consider various economic, geographic and health-care-related factors in setting rates, subject only to the requirement that the rates be reasonable and adequate for the efficient and economical operation of the facility (Public Health Law § 2807 [3]; § 2808 [2-a], [3]).
There is nothing to suggest that in fulfilling his rate-setting responsibilities under the Public Health Law, the Commissioner may not rely on inferences drawn from circumstantial evidence  a natural and necessary component in any decision-making process. Circumstantial proof is, of course, as probative as direct evidence and may be even more persuasive (see, 1A Wigmore, Evidence § 26, at 957, 961 [Tillers rev 1983]; People v Ford, 66 N.Y.2d 428, 442). Indeed, in Health Facilities *172 (supra), we recently sustained regulations that were, in large measure, based on the Commissioner's inferences from circumstantial evidence that nursing homes were unfairly discriminating against Medicaid patients in their admission and retention policies.
Here, the conclusion which the majority rejects as irrational  apparently because it is based largely on an inference from circumstantial evidence rather than on direct and concrete proof  is that the increase in CMI which necessitated the Medicaid rate recalibration resulted from "paper optimization" rather than from an actual change in patient condition. But the inference is compelled naturally and logically by the simple process of elimination.[4]
That "paper optimization" (i.e., more accurate compliance with newly imposed reporting requirements) is a generally recognized phenomenon is well documented (see, e.g., Simborg, DRG Creep: A New Hospital-Acquired Disease, N Eng J Med 304:1602-1604 [1981]; Hoke, Charting for Dollars, Am J of Nursing [June 1985]; Wennberg, Will Payment Based on Diagnosis-Related Groups Control Hospital Costs?, N Eng J Med 311:295-300 [1984]; Report and Recommendations to Secretary, US Dept of Health and Human Services, at 31-32 [1987]). The majority does not dispute this proposition or that "paper optimization" could have been a cause of the 1986 average CMI being greater than the 1985 average CMI (see, majority opn, at 167). The other possible causes for the higher 1986 CMI would, of course, be actual increases in the mix of sicker patients requiring greater care. But the Commissioner's proof eliminates these other potential causes with far more certainty than needed to satisfy the rationality standard and compels the conclusion that "paper optimization"  the uneliminated cause  explains the increase in the 1986 CMI. The majority attempts to cast doubt on the proof eliminating these other potential causes of the comparative increase in the 1986 average CMI over the 1985 CMI and on the validity of the resultant inference that "paper optimization" is the explanation. As will be explained (see, part II, infra), this effort is ineffectual.

*173 II
To discuss the Commissioner's proof in support of the 3.035% rate recalibration, the basic relationship between the Medicaid reimbursement rates and the 1985 average CMI must be understood. One of the variables used in the computation of the reimbursement rates under the new RUG-II system is the average CMI. The reimbursement rates are an inverse function of the average CMI  i.e., if the average CMI from which the rates are computed decreases, then the resultant reimbursement rates increase. Here, the initial reimbursement rates (i.e., before recalibration) were computed from the 1985 average CMI. If, as the proof demonstrates, the 1985 CMI was understated, it follows that the corresponding reimbursement rates would have been set too high and deserved recalibration.
Concededly, the 1985 CMI was lower than the 1986 CMI; and concededly some of the difference is explained by the fact that the nursing homes in 1986 were admitting new patients requiring more care as the RUG-II system encouraged them to do. For this part of the difference, of course, the Commissioner made no recalibration. However, part of the difference between the 1985 and 1986 CMIs is not explained by the actual increase in the quantity of sicker patients in the case mix but by the more accurate reporting of patient data in 1986 for the same patients, the phenomenon known as "paper optimization". In other words, "paper optimization", and the inadequacy of the 1985 data reporting which it reveals, establish that the 1985 average CMI was lower than would have been the case if the 1985 data had been reported accurately. The Commissioner's proof demonstrates clearly, in our view, the existence of "paper optimization" and a corresponding understatement of the 1985 CMI of between 3.2% and 3.9%  more than necessary to justify the Commissioner's recalibration of 3.035% to correct the resultant overstatement in the initial reimbursement rate.
That "paper optimization" would be expected to occur under the circumstances here cannot be disputed. The RUG system had just been instituted. The patient data from which the 1985 average CMI was computed came from newly required RUG-II reporting documents ("Patient Review Instruments" [PRIs]) which the facilities had never before used. The PRI is a complex and detailed reporting form consisting of 37 separate items and 15 pages of instructions. The report requires the collation and analysis of extensive physical and medical information *174 in making the sometimes difficult evaluation of a patient for placement in the proper RUG-II category. A PRI form must be submitted on behalf of each patient in a facility twice a year. In view of the complexity of this form, it is hardly surprising that the facilities reported the data with greater thoroughness and accuracy when they made their second filing in 1986. In fact, the Commissioner's informational bulletin to the facilities prior to the implementation of the RUG-II system advised them that just such a recalibration for "paper optimization" should be anticipated.
To establish the extent of the understatement in the 1985 average CMI due to inaccurate data reporting, the Commissioner compared the 1985 PRI data with the 1986 data for the same patients in the same facilities. New patients were excluded from the comparison. Since the comparison was limited to patients residing in the facilities in both years, any patient admitted in 1986 was not considered. Thus, the increase in CMI could not have resulted from the admission of new patients in 1986 requiring more intensive medical care.
Nor do the other possible explanations suggested by plaintiff for the 1986 CMI increase provide a reason for rejecting the Commissioner's conclusion. For example, the 1986 increase cannot be explained by the release of patients requiring less intensive care, as plaintiff surmises. On the contrary, the evidence establishes that patients requiring more intensive care in the higher CMI categories were discharged at a greater rate than those in the lower categories requiring less care. Additionally, the record evidence refutes plaintiff's suggestion that the increase was due to the over-all deterioration in patient condition or temporary changes in that condition. The statistical proof  comparing data pertaining to all of the 1985 and 1986 patients (including new admittees)  shows the same general over-all increase in CMI for the new short-term patients as for the previously admitted long-term patients.
Moreover, again totally refuting plaintiff's suggestion to the contrary, the 3.2% "paper optimization" increase in the 1986 average CMI  adopted by the Commissioner as the basis for his initially proposed 3.2% recalibration  cannot be attributed to the facilities providing more rehabilitation services to patients in 1986. The Department's analysis showing the 3.2% increase was based on a 1985-1986 comparison from which patients in the rehabilitation categories were excluded.
The fact that the 3.035% recalibration is a reduced figure *175 agreed to by the Commissioner after discussion and compromise with the facilities is certainly not a ground for holding that figure unreasonable. Initially, the Department sought a 3.2% reduction in reimbursement rates, corresponding to the 3.2% increase in average CMI for patients in groups other than rehabilitation. Thus, the negotiation and compromise to which the majority takes exception (see, majority opn, at 168) actually contributed to the adoption of a recalibration that was more favorable to nursing homes than the one the Department initially sought to impose (based on the 3.9% CMI increase when rehabilitation patients were included and 3.2% when they were excluded).
As noted, that recalibration would be necessary to correct the reimbursement rates for "paper optimization" was a probable eventuality foreseen from the very inception of the RUG-II system  a probability of which the facility operators were made fully aware. Thus, it can hardly be thought that the correction for "paper optimization" was adopted as an after-thought only because the department "did not like some of what [the] new [RUG-II] process had wrought" (majority opn, at 167).
Finally, there can be no merit to plaintiff's suggestion  espoused, it seems, by the majority (majority opn, at 168)  that because the recalibration effected an across-the-board reduction in the RUG-II reimbursement rates, a facility having more patients requiring intensive care in the higher RUG-II categories would somehow be deprived of its full compensation based on its actual CMI. The recalibration, of course, in no way altered any particular facility's CMI but effected only the reimbursement rates  the constant multipliers used in conjunction with a facility's CMI to compute the amount of its reimbursement.

III
The question here is not whether the Department can "document and substantiate its conclusion" (majority opn, at 168) by direct, concrete proof, as the majority holding clearly seems to require. The question is whether plaintiff can meet its burden of showing that the conclusion is unreasonable and unsupported by some evidence (see, Matter of Catholic Med. Center v Department of Health, 48 N.Y.2d 967, 968, supra). The fixing of Medicaid rates under the broad authority delegated to the Commissioner (Public Health Law § 2807 [3]; § 2808 [2-a], [3]) *176  like any rate-making determination (see, e.g., Public Service Law §§ 65, 66; Matter of Abrams v Public Serv. Commn., 67 N.Y.2d 205, 211-215, 217-218)  requires an exercise of judgment (see, Matter of Catholic Med. Center v Department of Health, supra, at 968-969). Here, the criteria established by the Legislature to guide the Commissioner in setting Medicaid rates are only that the rates be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities" (see, Public Health Law § 2807 [3]). It was in the exercise of this broad, rate-making authority that the Commissioner determined that the over-all Medicaid reimbursement rate should in fairness be recalibrated.
That "paper optimization" explains some of the 1986 CMI increase and thus justifies some recalibration of the reimbursement rates cannot be challenged. The extent of the justified recalibration is something that, by its very nature, cannot be established with mathematical certainty. Of necessity it requires proof by inference and an exercise of judgment in evaluating that proof. The ultimate question is whether the recalibration is reasonable and fair and whether there is not some evidentiary basis for it. To require more and, in effect, to impose a far stricter scrutiny than the rationality standard calls for is to engage in the sort of judicial second-guessing that the Legislature in its delegation of power to the Commissioner could not have contemplated (see, Public Health Law § 2807 [3]; § 2808 [2-a], [3]). In employing a strict scrutiny standard under the rubric of a test characterized as its "narrow holding of irrationality in this particular case" (majority opn, at 167),[5] the majority frustrates the fundamental policies underlying the concept of judicial deference and creates a significant and, we suspect, potentially troublesome precedent in what has been a well-established area of administrative law. For these reasons, we dissent.
Order reversed, with costs, and judgment of Supreme Court, Albany County, reinstated.
NOTES
[1] The plaintiff here represents the interest of 42 counties. But, the regulation relates to reimbursement rates applicable to public and private facilities alike (see, 10 NYCRR 86-2.3; see generally, Public Health Law §§ 2807, 2808).
[2] We agree with the majority's conclusion that the action was timely commenced within the four-month limitations period, measured from the facilities receipt of the Department's rate calculation notice on June 2, 1987.
[3] In Matter of Jewish Mem. Hosp. v Whalen (47 N.Y.2d 331), for example, the Court invalidated a regulation which disqualified 10% of facilities' educational costs from possible insurance reimbursement as costs not directly related to patient services. There, the Department had conceded that it never conducted a study of educational costs to justify its conclusion that 10% was the proper percentage to exclude from reimbursement as unrelated to patient care. Similarly, in Matter of Hawley v Cuomo (46 N.Y.2d 990), the Court invalidated a two-county nonsolicitation order issued by the Secretary of State, where the record was devoid of any evidence of racial blockbusting tactics on which the regulation was based.
[4] The majority's suggestion that the dissent is based on "`simple processes of elimination' at the appellate review stage" (majority opn, at 169) misses the point. It is not the Court, but the Commissioner, who has drawn the perfectly natural and proper inference from circumstantial evidence that the change in average CMI resulted from "paper optimization", the only potential cause which was not eliminated.
[5] Labeling the decision as "narrow" and other similar efforts to limit the breadth and effect of its holding (see, e.g., majority opn, at 169 [terming its decision a "straightforward application of the traditional judicial review function to a particular record and regulation"]), of course, cannot change what it does and what it means as a precedent. That the holding is not "narrow" and goes well beyond its purported application of "traditional review" will be seen if the entirely reasonable methods employed by the Commissioner in exercising his rule-making function are studied in this record.